## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE MARS DARK CHOCOLATE LITIGATION | Case No. 2:23-cv-00079-LDH-SIL<br><br>Hon. LaShann DeArcy Hall<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.    Plaintiffs Arlene Millman, Steven Prescott, Shelby Cooper, and Samantha Horton ("Plaintiffs") individually and on behalf of all others similarly situated bring this Consolidated Class Action Complaint against Defendant Mars, Inc., ("Defendant" or "Mars") for Defendant's reckless, and/or intentional practice of failing to disclose the presence of cadmium or lead (collectively the "Heavy Metals") in its Dove Promises Deeper Dark Chocolate 70% Cacao dark chocolate bar (the "Product").

2.    Lead is a dangerous and harmful chemical when consumed, especially by pregnant women and children.  Scientists agree that there is no level of lead that is safe. According to the Mayo Clinic, "[l]ead poisoning occurs when lead builds up in the body, often over months or years.  Even small amounts of lead can cause serious health problems. Children younger than 6 years are especially vulnerable to lead poisoning, which can severely affect mental and physical development.  At very high levels, lead poisoning can be fatal."[1]

3.    Cadmium is also a dangerous and harmful chemical when consumed.  Cadmium is used in many products unfit for human consumption, including batteries, pigments, metal

---

[1] *Lead Poisoning*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/lead-poisoning/symptoms-causes/syc-20354717 (accessed June 12, 2023).

coatings, and plastics, and is found in cigarette smoke. Exposure to even low levels of cadmium in air, food, water, and tobacco smoke over time lead to build up in the kidneys and cause kidney disease and osteopenia (weak bones). Furthermore, cadmium is considered a cancer-causing agent.[2]

4.     This action seeks both injunctive and monetary relief on behalf of the proposed Classes (as defined herein), including requiring full disclosure of all such substances on the Product's packaging and restoring monies to the members of the proposed Classes, who would not have purchased the Product had they known they contained (or were at risk of containing) the Heavy Metals and/or would not have paid premium prices for the Product had they known the Product contains Heavy Metals.

5.     Plaintiffs allege the following based upon personal knowledge, as well as investigation by their counsel as to themselves and, as to all other matters, upon information and belief. Plaintiffs believe substantial evidentiary support exists for the allegations set forth herein, which will become available after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

6.     Dark chocolate is often touted as being a healthier alternative to milk chocolate, however, a December 2022 report by Consumer Reports (the "Consumer Reports Article") revealed that certain dark chocolate bars, including the Product, had high enough levels of lead and cadmium that "eating just an ounce a day would put an adult over a level that public health authorities and [Consumer Reports] experts say may be harmful."[3]

---

[2] *Cadmium Factsheet*, CENTERS FOR DISEASE CONTROL AND PREVENTION, available at https://www.cdc.gov/biomonitoring/Cadmium_FactSheet.html (last accessed June 21, 2023).

[3] Kevin Loria, *Lead and Cadmium Could be in Your Dark Chocolate*, CONSUMER REPORTS (December 15, 2022), https://www.consumerreports.org/health/food-safety/lead-and-cadmium-in-dark-chocolate-a8480295550/.

7.      Heavy Metals in foods pose a significant safety risk to consumers because they can cause cancer and often irreversible damage to brain development as well as other serious health problems.

8.      Reasonable consumers expect the dark chocolate Product they purchase for their individual and family consumption will not be contaminated (or has a material risk of being contaminated) with Heavy Metals, substances that are known to accumulate in the body and pose significant and dangerous health consequences.

9.      Consumers lack the scientific knowledge necessary to determine whether Defendant's Product does in fact contains Heavy Metals, or to ascertain the true nature of the ingredients and quality of the Product.  Accordingly, reasonable consumers must and do rely on Defendant to: (1) know what its Product contains; (2) regularly test the Product to confirm its composition; and (3) properly and fully disclose its contents to consumers prior to purchase.  Full disclosure of a Product's contents, particularly contents like Heavy Metals, is material to a reasonable consumer's purchasing decisions.

10.     Defendant is involved in the manufacture, design, testing, packaging, labeling, marketing, advertising, promotion, distribution, and sales of the Product throughout the United States, including in this District.

11.     Defendant fails to disclose on its packaging that the Product contains (or has a material risk of containing) Heavy Metals.  The Product is pictured below:



12.    Reviewing the image above, no reasonable consumer would expect, suspect, or understand that the Product contains or has a material risk of containing Heavy Metals.

13.    Defendant fails to disclose to consumers that the Product contains (or has a material risk of containing) Heavy Metals.  Nowhere on the Product's packaging is it disclosed that it contains (or has a material risk of containing) Heavy Metals (hereinafter collectively referred to as "Omissions").  It was only through testing conducted by Consumer Reports that the general public became aware of the Heavy Metal content in Defendant's Product.

14.    Based on the Omissions, no reasonable consumer had any reason to know, suspect, or expect that the Product contained Heavy Metals.  Furthermore, reasonable consumers like Plaintiffs, who were purchasing the Product for consumption by themselves and their families, would consider the presence (or risk) of Heavy Metals to be a material fact when

considering whether to purchase the Product.  Accordingly, Plaintiffs and other reasonable consumers would not have purchased the Product or would have paid substantially less for it but for the Omissions.

15.     Defendant knows its customers trust the quality of its Product and would not expect the Product to contain or have a material risk of containing Heavy Metals.  Defendant also knows that reasonable consumers seek out and wish to purchase the Product with ingredients free of heavy metals or toxins, and that these consumers will pay more for a Product they believe meets these standards.  Defendant further knows that reasonable consumers would not knowingly consume, or feed to their families, a Product which contains Heavy Metals.

16.     Defendant knew the consumers to whom it markets the Product would find its Omissions material and that it was in a special position of public trust to those consumers.

17.     The Omissions are deceptive, misleading, unfair, and/or false because the Product contains undisclosed Heavy Metals.

18.     The Omissions allowed Defendant to capitalize on, and reap enormous profits from, reasonable consumers like Plaintiffs who paid a premium price for the Product that omitted material information as to the Product's true quality and value.  Reasonable consumers, including Plaintiffs, paid more for the Product than they would have had they known the truth about the Product, and Defendant continues to wrongfully induce consumers to purchase the Product.

19.     Plaintiffs bring this proposed consumer class action individually and on behalf of all other members of the Classes (as defined herein), who, during the Class Period, purchased for use and not resale any of Defendant's Product.

## JURISDICTION AND VENUE

20.     This Court has original jurisdiction over all causes of action herein under the

Class Action Fairness Act, 28 U.S.C. §1332(d)(2)(A), because the matter in controversy exceeds

the sum or value of $5,000,000.00, exclusive of interest and costs, and more than two-thirds of

the Classes reside in states other than the state in which Defendant is a citizen and in which this

case is filed, and therefore any exemptions to jurisdiction under 28 U.S.C. §1332(d)(2) do not

apply.

21.     This Court has personal jurisdiction over Defendant because Defendant conducts

and transacts business in the state of New York, and contracts to supply goods within the state of

New York, such that it has had continuous and systematic contacts with the state of New York.

Further, the Parties have agreed to try the action in the state of New York.

22.     Venue is proper in this Court pursuant to 28 U.S.C. §1391, because Plaintiff

Millman suffered injury as a result of Defendant's acts in this District, many of the acts and

transactions giving rise to this action occurred in this District, Defendant conducts substantial

business in this District, and because Plaintiffs and Defendant have agreed to consolidate the

actions together in this District.

## PARTIES

I.      **PLAINTIFFS**

    A.      **Arlene Millman**

23.     Plaintiff Arlene Millman is a citizen of New York and resides in the city of

Huntington, New York.  Plaintiff Millman has purchased Defendant's Product for years and has

frequently purchased them from her local Walgreens, CVS, and Stop & Shop.  Most recently,

Plaintiff purchased the Product in approximately November 2022.  Plaintiff Millman believed

she was purchasing quality and safe dark chocolate that did not contain (or risk containing) Heavy Metals.  Had Defendant disclosed on the label that the Product contained (or risked containing) unsafe toxic Heavy Metals, Ms. Millman would have been aware of that fact and would not have purchased the Product or would have paid less for it.

24.     Ms. Millman continues to desire to purchase the Product from Defendant. However, Ms. Millman is unable to determine if the Product is actually safe.  Ms. Millman understands that the composition of the Product may change over time.  But as long as Defendant continues to market its Product as safe while it still contains unsafe levels of Heavy Metals, she will be unable to make informed decisions about whether to purchase Defendant's Product and will be unable to evaluate the different prices between Defendant's Product and its competitors' products.  Ms. Millman is further likely to be repeatedly misled by Defendant's conduct, unless and until Defendant is compelled to ensure that the Product marketed, labeled, packaged, and sold as safe dark chocolate is, in fact, safe to consume.

**B.     Steven Prescott**

25.     Plaintiff Steven Prescott is a citizen and domiciliary of California.  Plaintiff Prescott purchased Defendant's Product for approximately $7 at a CVS store in Santa Cruz, California, in or around Spring or Summer 2022.  Plaintiff Prescott believed he was purchasing quality and safe dark chocolate that did not contains (or risk containing) Heavy Metals.  Had Defendant disclosed on the label that the Product contained (or risked containing) unsafe toxic Heavy Metals, Mr. Prescott would have been aware of that fact and would not have purchased the Product or would have paid less for it.

26.     Mr. Prescott continues to desire to purchase the Product from Defendant. However, Mr. Prescott is unable to determine if the Product is actually safe.  Mr. Prescott

understands that the composition of the Product may change over time.  But as long as Defendant continues to market its Product as safe while it still contains unsafe levels of Heavy Metals, he will be unable to make informed decisions about whether to purchase Defendant's Product and will be unable to evaluate the different prices between Defendant's Product and its competitors' products.  Mr. Prescott is further likely to be repeatedly misled by Defendant's conduct, unless and until Defendant is compelled to ensure that a Product marketed, labeled, packaged and sold as safe dark chocolate is, in fact, safe to consume.

**Shelby Cooper**

27.     Plaintiff Shelby Cooper is a resident of the state of California. Plaintiff Cooper purchased the Products during the Class Period from a Walmart retail store located in Riverside, California. Prior to purchasing the Products, Plaintiff Cooper read the Products' labels and purchased the Products in reliance on Defendant's representation that the Products contained only the ingredients listed on the Products' packaging and were safe for consumption. Plaintiff Cooper believed she was purchasing quality and safe dark chocolate that did not contain (or risk containing) Heavy Metals.  Had Defendant disclosed on the label that the Product contained (or risked containing) unsafe toxic Heavy Metals, Ms. Cooper would have been aware of that fact and would not have purchased the Product or would have paid less for it.

28.     Ms. Cooper continues to desire to purchase the Product from Defendant. However, Ms. Cooper is unable to determine if the Product is actually safe.  Ms. Cooper understands that the composition of the Product may change over time.  But as long as Defendant continues to market its Product as safe while it still contains unsafe levels of Heavy Metals, she will be unable to make informed decisions about whether to purchase Defendant's Product and will be unable to evaluate the different prices between Defendant's Product and its

competitors' products.  Ms. Cooper is further likely to be repeatedly misled by Defendant's conduct, unless and until Defendant is compelled to ensure that the Product marketed, labeled, packaged, and sold as safe dark chocolate is, in fact, safe to consume.

**Samantha Horton**

29.     Plaintiff Samantha Horton is a resident of the state of Ohio.  Plaintiff Horton purchased the Products during the Class Period from a Rite Aid retail store located in Canton, Ohio. She also purchased the Affected Products from Amazon.com. Prior to purchasing the Products, Plaintiff Horton read the Products' labels and purchased the Products in reliance on Defendant's representation that the Products contained only the ingredients listed on the Products' packaging and were safe for consumption.  Plaintiff Horton believed she was purchasing quality and safe dark chocolate that did not contain (or risk containing) Heavy Metals.  Had Defendant disclosed on the label that the Product contained (or risked containing) unsafe toxic Heavy Metals, Ms. Horton would have been aware of that fact and would not have purchased the Product or would have paid less for it.

30.     Ms. Horton continues to desire to purchase the Product from Defendant. However, Ms. Horton is unable to determine if the Product is actually safe.  Ms. Horton understands that the composition of the Product may change over time.  But as long as Defendant continues to market its Product as safe while it still contains unsafe levels of Heavy Metals, she will be unable to make informed decisions about whether to purchase Defendant's Product and will be unable to evaluate the different prices between Defendant's Product and its competitors' products.  Ms. Horton is further likely to be repeatedly misled by Defendant's conduct, unless and until Defendant is compelled to ensure that the Product marketed, labeled, packaged, and sold as safe dark chocolate is, in fact, safe to consume.

## II.   DEFENDANT

31.   Defendant Mars Inc. is a foreign corporation with its domestic headquarters located at 9885 Elm Street, McLean, Virginia 22101.  Mars is a leading manufacturer, packager, and distributor of, among other products, candy and confectionary.  Mars has done business throughout New York and the United States at all times during the Class Period.  At all relevant times, Mars has advertised, marketed, manufactured, distributed, and sold candy and confectionary, including the Product at issue in and throughout New York.  At all relevant times, Mars formulated, directed, controlled, had the authority to control, and/or participated in the acts and practices set forth in this Complaint.

32.   Plaintiffs relied upon the material Omissions missing from the Product packaging, which was prepared, reviewed, and/or approved by Defendant and its agents and disseminated by Defendant and its agents through packaging that contained the Omissions.  The Omissions were nondisclosed material content that a reasonable consumer would consider important in purchasing the Product.

## **FACTUAL ALLEGATIONS**

## I.   CONSUMER REPORTS' INVESTIGATION FINDS THE PRESENCE OF HEAVY METALS IN THE PRODUCT

33.   In December 2022, Consumer Reports published a blockbuster report detailing the prevalence of Heavy Metals in dark chocolate products.[4]  Consumer Reports tested 28 dark chocolate bars for lead and cadmium from a variety of brands.[5]

34.   The tested dark chocolate included Defendant's Product.[6]

---

[4] Consumer Reports Article.

[5] *Id*.

[6] *Id*.

35.     Using reliable and accepted testing techniques, Consumer Reports showed that the Product contains undisclosed levels of lead and/or cadmium.[7]

36.     As noted in the Consumer Reports Article, consumers "choose dark chocolate in particular for its potential health benefits, thanks to studies that suggest its rich supply of antioxidants may improve heart health and other conditions, and for its relatively low levels of sugar."[8]  A recent survey from the National Confectioners Association, referenced in the Consumer Reports Article, found that more than half of the survey participants described dark chocolate as a "better for you" candy.[9]

37.     The Consumer Reports Article concluded that "[f]or 23 of the bars tested, eating just an ounce a day would put an adult over a level that public health authorities and CR's experts say may be harmful for at least one of those heavy metals.  Five of the bars were above those levels for both cadmium and lead."[10]

38.     For example, Consumer Reports tested Defendant's Product and found that it contained 74% of the MADL of lead, and 112% of the MADL for cadmium in just one ounce of the Product's 7.23 ounces.[11]

---

[7] *See Heavy Metals in Chocolate Bars: Test Methodology*, CONSUMER REPORTS, Jan. 2023, available at https://article.images.consumerreports.org/image/upload/v1672933163/prod/content/dam/CRO-Images-2022/Special%20Projects/Consumer_Reports_Test_Methodology_for_Heavy_Metals_in_Chocolate_Bars_-_January_2023.pdf (last accessed May 11, 2023).

[8] Consumer Reports Article.

[9] *Id.*

[10] *Id.*

[11] *Id.*; Proposition 65 No Significant Risk Levels (NSRLs) and Maximum Allowable Dose Levels (MADLs), California Office of Environmental Health Hazard Assessment, Oct. 1, 2021, available at https://oehha.ca.gov/proposition-65/general-info/current-proposition-65-no-significant-risk-levels-nsrls-maximum (last accessed May 11, 2023).

39.     The Consumer Reports Article warned consumers that dark chocolate tends to be higher in heavy metals than milk chocolate, likely because of its higher cacao content.[12] "[C]acao plants take up cadmium from the soil, with the metal accumulating in cacao beans as the tree grows."[13] Lead, on the other hand, does not appear in cacao beans naturally; rather, lead is introduced in various ways from the soil where the cacao beans are grown and the water used for irrigation to the equipment used to process the beans.[14]

40.     Further, the Consumer Reports Article identified potential solutions to minimize or omit the presence of lead in cacao, including changes in harvesting and manufacturing practices.[15] Such practices include "minimizing soil contact with [cacao] beans as they lie in the sun, and drying beans on tables or clean tarps away from roads or with protective covers, so lead-contaminated dust won't land on [the cacao beans]."[16] Another option is implementing procedures and/or methods to remove metal contaminants when beans are cleaned at factories.[17]

41.     Getting cadmium out of cacao is also possible by carefully breeding or genetically engineering plants to absorb less of the heavy metal.[18] "Other potential options include replacing older cacao trees with younger ones, because cadmium levels tend to increase as the plants get older, and removing or treating soil known to be contaminated with cadmium."[19]

---

[12] Consumer Reports Article.

[13] *Id*.

[14] *Id*.

[15] *Id*.

[16] *Id*.

[17] *Id*.

[18] *Id*.

[19] *Id*.

## II.     DEFENDANT OMITS ANY MENTION OF HEAVY METALS ON ITS PACKAGING

42.     Defendant manufactures, designs, tests, packages, labels, markets, advertises, promotes, distributes, and sells its Product throughout the United States, including in California and New York.

43.     Defendant's Product is available at numerous retail and online outlets throughout the United States, including California and New York.

44.     Defendant knows or should know that the Product contains or has a material risk of containing Heavy Metals yet failed to disclose this fact to consumers.

45.     Defendant intentionally omitted the presence or material risk of Heavy Metals in the Product in order to induce and mislead reasonable consumers to purchase the Product and pay a price premium for it.

46.     As a result of the material Omissions, a reasonable consumer would have no reason to suspect the presence of or material risk of Heavy Metals in the Product without conducting his or her own scientific tests (which are time consuming and expensive) or reviewing third-party scientific testing of the Product.

47.     Information regarding the true nature and/or presence of Heavy Metals in the Product was and is in the exclusive possession of Defendant and not available to consumers. Defendant chose to not disclose such information to consumers and thus concealed the presence and risk of Heavy Metals in the Product from Plaintiffs and Class members.

III.   **DUE TO THE PRESENCE AND/OR MATERIAL RISK OF THE PRESENCE OF HEAVY METALS IN THE PRODUCT, THE OMISSIONS ARE MISLEADING**

A.   **Heavy Metals**

48.   Cadmium and lead are heavy metals whose harmful effects are well-documented, particularly in children.  Exposure to heavy metals puts children at risk for lowered IQ, behavioral problems (such as attention deficit hyperactivity disorder), type 2 diabetes, and cancer, among other health issues.  Heavy metals also pose health risks to adults.  Even modest amounts of heavy metals can increase the risk of cancer, cognitive and reproductive problems, and other adverse conditions.  These facts underscore the importance of limiting heavy metal exposure and consumption.

49.   Given the negative effects of heavy metals (such as cadmium and lead) on child development and adult health, the presence of these substances in food is material to reasonable consumers, including Plaintiffs and members of the Classes, as it relates to their purchasing decisions.

50.   Defendant knows that the presence (or material risk) of Heavy Metals in its Product is material to reasonable consumers, including Plaintiffs and the Class members.

51.   At all times during the relevant period, Defendant knew or should have known the Product included undisclosed levels of Heavy Metals and was not sufficiently tested for the presence and material risk of Heavy Metals.

52.   The December 2022 Consumer Reports Article was not the first time that Defendant has been alerted to the fact that its Product contains detectable levels of cadmium and lead.

53.   In 2016, As You Sow, a California-based consumer advocacy group, performed a study of the heavy metal content of cocoa products.  The group sent samples of 50 different

15

chocolate products to a third-party lab and discovered that more than half of these samples contained lead and cadmium.  The levels at which cadmium was present exceeded California's which is based on California's Proposition 65 safe harbor levels of 4.1 micrograms for cadmium.[20]  The study purposefully did not disclose the exact levels contained within specific products, in hopes that manufacturers would partner with As You Sow to address the high levels of lead and cadmium in their respective product lines.  Ultimately, Defendant and other manufacturers agreed to regularly test their chocolate products and to include warning labels on those that exceeded lead and cadmium threshold levels agreed upon by As You Sow and the manufacturers.[21]

54.    As You Sow's efforts effectively put Defendant on notice that it had a duty to test its Products for the presence of heavy metals and subsequently remove them, or adequately disclose to consumers that these heavy metals were present in its products and posed serious health risks to consumers.  Yet, as Consumer Reports' recent study reveals, the Product contains harmful levels of heavy metals and fails to include any warning to consumers about their existence.

55.    Therefore, at least since 2016 Defendant knew that the presence (or risk) of Heavy Metals in its Product was material to reasonable consumers, including Plaintiffs and the Class members.

---

[20] "Proposition 65," California Office of Environmental Health Hazard Assessment, OEHHA, https://oehha.ca.gov/proposition-65.

[21] *As You Sow v. Trader Joe's Company, et al.,* No CGC-15-548791 (Consent Judgment, Feb. 15, 2018).

56.     Defendant's Product included undisclosed levels of Heavy Metals due to Defendant's failure to sufficiently monitor for their presence in the ingredients and finished Product.  Defendant was or should have been aware of this risk.

57.     Defendant knew or should have known that Heavy Metals pose health risks to consumers.

58.     Defendant knew or should have known that it owed consumers a duty of care to prevent, or at the very least, minimize the presence of Heavy Metals in the Product to the extent reasonably possible.

59.     Defendant knew or should have known that it owed consumers a duty of care to adequately test for Heavy Metals in the Product and the contributing ingredients.

60.     Defendant knew or should have known consumers reasonably expect that the Product does not contain (or has a material risk of containing) Heavy Metals.

61.     The Food and Drug Administration ("FDA") and the World Health Organization ("WHO") have declared cadmium and lead "dangerous to human health."[22]

62.     The FDA has acknowledged that "exposure to these [heavy metals] are likely to have the most significant impact on public health" and has prioritized them in connection with its Toxic Elements Working Group to look at reducing the risks associated with human consumption of heavy metals.[23]

---

[22] U.S. HOUSE OF REPRESENTATIVES COMMITTEE ON OVERSIGHT AND REFORM, SUBCOMMITTEE ON ECONOMIC AND CONSUMER POLICY, STAFF REPORT: BABY FOODS ARE TAINTED WITH DANGEROUS LEVELS OF ARSENIC, LEAD, CADMIUM, AND MERCURY 2 (2021) https://oversightdemocrats.house.gov/sites/democrats.oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf ("House Report") (last accessed May 11, 2023).

[23] *Environmental Contaminants in Food*, U.S. Food & Drug Administration, available at https://www.fda.gov/Food/FoodborneIllnessContaminants/Metals/default.htm (last accessed May 11, 2023).

63.     Lead and cadmium are neurotoxins, or poisons, which affect the nervous system. As explained by the Consumer Reports Article:

> Consistent, long-term exposure to even small amounts of heavy metals can lead to a variety of health problems. The danger is greatest for pregnant people and young children because the metals can cause developmental problems, affect brain development, and lead to lower IQ, says Tunde Akinleye, the CR food safety researcher who led this testing project. "But there are risks for people of any age," he says. Frequent exposure to lead in adults, for example, can lead to nervous system problems, hypertension, immune system suppression, kidney damage, and reproductive issues.[24]

64.     Heavy Metals bioaccumulate in the body, meaning the body cannot excrete the toxins as quickly as they are absorbed and the risk they pose increases over time and can remain in one's body for years.[25]

65.     Concerns over exposure to Heavy Metals, and the knowledge of such risks associated with exposure, are not a new phenomenon, and Defendant knew or should have known of the risks associated with the presence of Heavy Metals in foods it sells to consumers.[26]

66.     Despite the known risks of exposure to Heavy Metals, Defendant has recklessly and/or knowingly sold the Product without disclosing to consumers like Plaintiffs and members of the Classes that the Product contains (or has a material risk of containing) Heavy Metals.

---

[24] Consumer Reports Article.

[25] *Heavy Metals in Baby Food: What You Need to Know*, CONSUMER REPORTS, Aug. 16, 2018 (updated Sept. 29, 2021), available at https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/ (last accessed May 11, 2023).

[26] *See*, *e.g*., FDA Compliance Program Guidance Manual: Toxic Elements in Food and Foodware, and Radionuclides in Food – Import and Domestic, http://wayback.archive-it.org/7993/20170404233343/https://www.fda.gov/downloads/Food/ComplianceEnforcement/UCM073204.pdf (last accessed May 11, 2023); *see also* 21 C.F.R. § 172.

**B.**     **Cadmium**

67.     The Product contains (or has a material risk of containing) cadmium, which is considered a cancer-causing agent.[27]

68.     "[A]ny cadmium exposure should be avoided."[28]  Exposure to even low levels of cadmium over time may build up cadmium in the kidneys and cause kidney disease and bone loss.[29]

69.     Cadmium exposure can affect the gastrointestinal system, as well as lead to hemorrhagic gastroenteritis, liver and kidney necrosis, cardiomyopathy, and metabolic acidosis.[30]

70.     Exposure to cadmium is also linked to cardiovascular disease and cancer.[31]

71.     Scientists have reported a "tripling of risk for learning disabilities and special education among children with higher cadmium exposures, at exposure levels common among U.S. children."[32]

---

[27] CENTERS FOR DISEASE CONTROL AND PREVENTION, CADMIUM FACTSHEET, available at https://www.cdc.gov/biomonitoring/cadmium_factsheet.html (last accessed May 11, 2023).

[28] M. Nathaniel Mead, *Cadmium Confusion: Do Consumers Need Protection?*, 118 ENVIRONMENTAL HEALTH PERSPECTIVES 528, 530 (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3002210/ (last accessed May 11, 2023).

[29] *Id.*

[30] AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY, CADMIUM TOXICITY: WHAT HEALTH EFFECTS ARE ASSOCIATED WITH ACUTE HIGH-DOSE CADMIUM EXPOSURE? available at https://www.atsdr.cdc.gov/csem/cadmium/Acute-Effects.html (last accessed May 11, 2023).

[31] M. Nathaniel Mead, *Cadmium Confusion: Do Consumers Need Protection?*, 118 ENVIRONMENTAL HEALTH PERSPECTIVES at 531.

[32] Is Homemade Baby Food Better? A New Investigation: Tests Compare Toxic Heavy Metal Contamination in Homemade Versus Store-Bought Foods for Babies, Healthy Babies Bright Futures, Aug. 2022, at 69 ("Healthy Babies Bright Futures Report"), available at https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2022-08/StoreVsHomemade_2022.pdf (last accessed May 11, 2023).

72.     Cadmium, like lead, "displays a troubling ability to cause harm at low levels of exposure."[33]  The U.S. Department of Health and Human Services has determined that cadmium and cadmium compounds are known human carcinogens and the EPA has likewise determined that cadmium is a probable human carcinogen.[34]

73.     Compounding such concerns is the fact that cadmium has a prolonged half-life as it "sequester[s] in [human] tissue."[35]

**C.     Lead**

74.     The Product contains (or has a material risk of containing) lead, which is extremely toxic.  "No amount of lead is known to be safe,"[36] and its harmful effects cannot be reversed or remediated.[37]

75.     Exposure to lead can result in neuropathy and brain damage, hypertension, decreased renal function, increased blood pressure, and gastrointestinal and cardiovascular effects, and can also cause reduced fetal growth or lower birth weights in pregnant women.[38]

---

[33] *Id.*

[34] AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY, PUBLIC HEALTH STATEMENT FOR CADMIUM, https://wwwn.cdc.gov/TSP/PHS/PHS.aspx?phsid=46&toxid=15 (last accessed May 11, 2023).

[35] Stephen J. Genius et al., *Toxic Element Contamination of Natural Health Products and Pharmaceutical Preparations*, PLOS ONE (Nov. 21, 2012), available at https://doi.org/10.1371/journal.pone.0049676 (last accessed May 11, 2023).

[36] *Lead Levels Below EPA Limits Can Still Impact Your Health*, NPR (Aug. 13, 2016), available at https://www.npr.org/sections/thetwo-way/2016/08/13/489825051/lead-levels-below-epalimits-can-still-impact-your-health (last accessed May 11, 2023).

[37] *Heavy Metals in Baby Food: What You Need to Know*, CONSUMER REPORTS, Aug. 16 2018 (updated Sept. 29, 2021), available at https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/ (last accessed May 11, 2023).

[38] AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY, WHAT ARE POSSIBLE HEALTH EFFECTS FROM LEAD EXPOSURE?, https://www.atsdr.cdc.gov/csem/leadtoxicity/physiological _effects.html (last accessed May 11, 2023).

76.     Lead is a carcinogen and lead exposure can seriously harm the brain and nervous system in children.  Lead is also associated with a range of negative health outcomes such as behavioral problems, decreased cognitive performance, delayed puberty, and reduced postnatal growth.

77.     Exposure to lead in foods builds up over time.  Lead build-up can and has been scientifically demonstrated to lead to the development of chronic poisoning, cancer, developmental, and reproductive disorders, as well as serious injuries to the nervous system, and other organs and body systems.

78.     Even very low exposure levels to lead can "cause lower academic achievement, attention deficits, and behavior problems.  No safe level of exposure has been identified."[39]

## IV.     Dark Chocolate Can Be Manufactured with Heavy Metals Below California's Maximum Allowable Dose Levels

79.     Dark chocolate manufacturers, such as Taza, are able to produce dark chocolate products with levels of lead and cadmium below California's MADL.[40]

80.     The Consumer Reports Article noted that "while most of the chocolate bars in CR's tests had concerning levels of lead, cadmium, or both, five of them were relatively low in both," showing it is possible to make the Product with lower amounts of heavy metals.[41] Furthermore, the Consumer Reports Article went on to say that "while contamination with heavy metals is common, *it is not inevitable*."[42]

---

[39] Healthy Babies Bright Futures Report at 18; *see also* House Report at 11.

[40] Consumer Reports Article.

[41] *Id*.

[42] *Id*. (emphasis added).

81.     In addition, as a result of public health efforts, exposure to lead has consistently and notably decreased over the past 40 years.[43]  These efforts include increasing awareness of the dangers of even low levels of lead exposure to young children.[44]  The progress towards decreasing childhood exposure to lead was so impressive that the Centers for Disease Control and Prevention ("CDC") identified "childhood lead poisoning prevention as 1 of 10 great US public health achievements during 2001 to 2010."[45]

## V.     THE MATERIAL OMISSIONS MISLED AND DECEIVED REASONABLE CONSUMERS

82.     On average, each American consumes nearly twelve pounds of chocolate per year.  This appetite for chocolate is warranted.  Not only is chocolate tasty, but studies show that it has positive physical effects on humans, which is why the product has been sought after for thousands of years.  Chemicals in chocolate have been shown to trigger euphoria, the same endorphins that trigger the "in love" feeling in humans, which is why chocolate is unsurprisingly the go-to Valentine's Day gift.  In surveys measuring flavors, chocolate consistently remains the favorite.  Chocolate's ability to increase alertness and energy is well-documented, which is why chocolate has been standard issue to U.S. servicemen since George Washington.  The effects of chocolate are so well-known, it has been an integral part of the cultural psyche since the Aztecs.  Even modern examples like the 1971 film Willy Wonka & the Chocolate Factory and the 2000

---

[43] Timothy Dignam et al., *Control of Lead Sources in the United States, 1970-2017: Public Health Progress and Current Challenges to Eliminating Lead Exposure*, Journal of Public Health Management and Practice, Jan.-Feb. 2019, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6522252/#R6 (last accessed May 11, 2023).

[44] *Id*.

[45] *Id*.

film Chocolate reference chocolate's cultural impact.  Diners would be hard-pressed to see a dessert menu that did not contains at least one chocolate dessert.

83.     The popularity of dark chocolate has been on the rise in recent years due to its health benefits, which include being densely packed with antioxidants that can help protect against heart disease and stroke, and flavonoids that have been shown to lower blood pressure and improve blood flow to the brain.  Cocoa beans, or the seeds from cacao trees, are one of the best-known sources of dietary polyphenols, containing more phenolic antioxidants than most foods inducing positive effects on blood pressure, insulin resistance, and vascular function.[46]

84.     Indeed, the growth of dark chocolate sales has been driven by its popularity among health-conscious consumers and increasing awareness regarding potential health benefits associated with its consumption.  The health attributes of dark chocolate and their positive effects on well-being are material to reasonable consumers.

85.     By extension, the negative effects of toxic heavy metals (such as lead and cadmium) on child development and adult health, the presence of these substances in dark chocolate is a material fact to reasonable consumers, including Plaintiff and members of the Class.

86.     Accordingly, Defendant knows that whether its Product contains carcinogens like the Heavy Metals is a material fact to reasonable consumers.

87.     The Omissions wrongfully convey to consumers that Defendant's Product is of a superior quality and has certain characteristics that it does not actually possess.

---

[46] Valeria Ludovici et al., *Cocoa, Blood Pressure, and Vascular Function*, FRONTIERS IN NUTRITION, Aug. 2, 2017, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5539137/ (last accessed May 11, 2023).

88.     Defendant misleadingly causes consumers to believe its Product does not contain Heavy Metals due to the material Omissions, when in fact the Product contains or has a material risk of containing undisclosed levels of Heavy Metals, which is material information to reasonable consumers and Plaintiffs.

89.     For example, the testing conducted by Consumer Reports of Defendant's Product showed that the tested Product contained undisclosed levels of Heavy Metals.[47]

90.     Defendant wrongfully failed to disclose to reasonable consumers material information regarding the presence of (or material risk of) Heavy Metals in the Product.

91.     Due to the Omissions, reasonable consumers, like Plaintiffs, would not suspect the presence of Heavy Metals in the Product.  Unlike Defendant, reasonable consumers are not able to independently detect the presence of Heavy Metals in the Product and are generally without the means to conduct their own scientific tests or to review scientific testing conducted on the Product.  Moreover, information regarding the presence of Heavy Metals in the Product is in the exclusive possession of Defendant and not available to consumers.  Defendant chose to not disclose such information to consumers and thus actively concealed the presence and risk of Heavy Metals in the Product.

92.     Reasonable consumers must and do rely on Defendant to honestly report what its Product contains.

93.     Based on the impression created by the failure to disclose the Heavy Metals on the packaging, no reasonable consumer would expect, suspect, or understand that the Product contained or had a material risk of containing Heavy Metals.

---

[47] *See* Consumer Reports Article.

94.     Defendant had a duty to ensure the Product was not deceptively, misleadingly, unfairly, and falsely marketed and that all material information was properly and fully disclosed.

95.     Defendant acted negligently, recklessly, unfairly, and/or intentionally with its deceptive packaging based on the material Omissions.

96.     Defendant knew that properly and sufficiently monitoring the Product for Heavy Metals in the ingredients and finished Product was critical.

97.     In addition, Defendant knew or should have known that a reasonable consumer would consume the Product regularly, leading to repeated exposure to and accumulation of Heavy Metals.

98.     Defendant knew or should have known it could control the levels of Heavy Metals in the Product by properly monitoring and testing for Heavy Metals at ingredient sourcing, manufacturing, and packaging stages, and effecting changes when needed.

99.     The Omissions are material and reasonably likely to deceive reasonable consumers in their purchasing decisions, such as Plaintiffs.

100.     The Omissions make the Product's packaging deceptive based on the presence or risk of Heavy Metals in the Product.  Reasonable consumers, like Plaintiffs, would consider the presence or risk of Heavy Metals in the Product a material fact when considering which dark chocolate Product to purchase.

101.     Defendant knew, yet failed to disclose, that it was not sufficiently or adequately monitoring or testing the Product or ingredients used in the Product for Heavy Metals.

102.     The Omissions were misleading due to Defendant's failure to sufficiently or adequately monitor or test for and disclose the presence (or material risk) of Heavy Metals in the Product.

103.    Defendant knew or should have known that the Product contained or may contain undisclosed levels of Heavy Metals that were not disclosed on the packaging.

104.    Defendant knew or should have known that reasonable consumers expected Defendant to sufficiently monitor and test the Product and ingredients for Heavy Metals to ensure the quality of the Product.

105.    Defendant knew or should have known that reasonable consumers paid higher prices for the Product and expected Defendant to sufficiently test and monitor the Product and ingredients for the presence of Heavy Metals.

106.    The Omissions are material and render the Product's packaging deceptive because without full disclosure, reasonable consumers believe the Product is a safe, high-quality Product, that would not contain or have a material risk of containing Heavy Metals.

107.    The Omissions were intended to and did, in fact, cause consumers like Plaintiffs and the members of the Classes to purchase Product they would not have if the true quality and ingredients were disclosed or for which they would not have paid a premium price.

108.    As a result of Defendant's Omissions, Defendant was able to generate substantial sales, which allowed Defendant to capitalize on, and reap enormous profits from, Plaintiffs and similarly situated consumers who paid the purchase price or premium for the Product.

109.    Plaintiffs and other reasonable consumers would not have purchased the Product or would have paid less for it but for Defendant's Omissions concerning the presence (or material risk of the presence) of Heavy Metals in the Product.

**VI.    PLAINTIFFS' RELIANCE WAS REASONABLE AND FORESEEABLE BY DEFENDANT**

110.     Plaintiffs read and relied upon the packaging of the Product when making their purchasing decisions.  Had they known Defendant omitted and failed to disclose the presence of Heavy Metals on the Product's packaging, they would not have purchased the Product.

111.     Reasonable consumers, like Plaintiffs, would consider the packaging of a product when deciding whether to purchase it.

## VII.    DEFENDANT'S KNOWLEDGE AND NOTICE OF ITS BREACH OF IMPLIED WARRANTIES

112.     Defendant had sufficient notice of its breach of implied warranties.  Defendant has, and had, exclusive knowledge of the physical and chemical make-up of the Product. Defendant also had exclusive knowledge of its suppliers, and whether any suppliers provided ingredients that contained Heavy Metals.

113.     Furthermore, Defendant was put on notice by, *inter alia*, the consent judgment it was subject to in *As You Sow v. Trader Joe's Company, Inc.*, No. CGC-15-548791 (Cal. Sup. Ct. Feb. 15, 2018).  As You Sow, a nonprofit organization, filed suit against Trader Joe's Company, Inc., and many other chocolate manufacturers including Mars for its failure to warn California residents of the presence of lead and cadmium in its Product.  The parties reached a consent judgment whereby the defendants, including Mars, were required to include Product Trigger Warnings should they exceed an agreed upon concentration of lead, cadmium, or both.[48]  In order to comply, regular testing for lead and cadmium levels were required.  Thus, Defendant had knowledge that its Product contained Heavy Metals.

---

[48] *Court Establishes Guidelines for Chocolate Sold in Californnia,* AS YOU SOW, February 15, 2018, https://www.asyousow.org/press-releases/2018/2/14/court-establishes-guidelines-for-chocolate-sold-in-california (accessed June 2, 2023).

114.     Defendant was also put on notice by, *inter alia*, the December 2022 Consumer Reports Article that identified the presence of Heavy Metals in Defendant's Product.

115.     Defendant has not changed its packaging to include any disclaimer that the Product contains (or are at the risk of containing) Heavy Metals.

## VIII.   PRIVITY EXISTS WITH PLAINTIFFS AND THE PROPOSED CLASSES

116.     Defendant knew that reasonable consumers such as Plaintiffs and the proposed members of the Classes would be the end purchasers of the Product and the targets of its advertising.

117.     Defendant intended that the packaging and implied warranties would be considered by the end purchasers of the Product, including Plaintiffs and the proposed members of the Classes.

118.     Defendant directly marketed to Plaintiffs and the proposed Classes through the Product's packaging.

119.     Plaintiffs and the proposed members of the Classes are the intended beneficiaries of the implied warranties.

## FED. R. CIV. P. 9(b) ALLEGATIONS

120.     Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  To the extent necessary, as detailed in the paragraphs above and below, Plaintiffs have satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity.

121.     **WHO**: Defendant made material omissions of fact in its packaging of the Product by omitting the presence (or risk) of significant amounts of unsafe Heavy Metals.

122.   **WHAT**: Defendant's conduct was and continues to be fraudulent and deceptive because it has the effect of deceiving consumers into believing that the Product does not contain (or risk containing) significant amounts of Heavy Metals.  Defendant omitted from Plaintiffs and Class members that the Product contains (or risk containing) Heavy Metals.  Defendant knew or should have known this information is material to all reasonable consumers and impacts consumers' purchasing decisions.  Yet, Defendant has omitted from the Product's labeling the fact that they contain (or risk containing) Heavy Metals.

123.   **WHEN**: Defendant omitted from the Product's labeling the fact that the Product contains (or risks containing) significant amounts of unsafe Heavy Metals, continuously throughout the applicable relevant periods, including at the point of sale.

124.   **WHERE**: Defendant's Omissions were made on the front labeling and packaging of the Product and were thus viewed by every purchaser, including Plaintiffs, at the point of sale in every transaction.  The Product is sold in brick-and-mortar stores and online stores nationwide.

125.   **HOW**: Defendant omitted from the Product's labeling the fact that it contains (or risks containing) Heavy Metals.  And, as discussed in detail throughout this Complaint, Plaintiff and Class members read and relied on Defendant's front-label Omissions before purchasing the Product.

126.   **WHY**: Defendant omitted from the Product's labeling the fact that it contains (or risks containing) Heavy Metals for the express purpose of inducing Plaintiffs and Class members to purchase the Product at a substantial price premium or more than they would have paid had they known the truth about the Product.  As such, Defendant profited by selling the Product to at least thousands of consumers throughout the nation, including Plaintiffs and the Class members.

## CLASS ACTION ALLEGATIONS

127.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil

Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of themselves and all others similarly situated,

as members of the following classes against Defendant:

> **Class:** All persons within the United States who, from January 5, 2018, to the present, purchased the Product for household use, and not for resale.
>
> **California Subclass:** All persons who, from January 5, 2018, to the present, purchased the Product for household use, and not for resale in the state of California.
>
> **New York Subclass:** All persons who, from January 5, 2018, to the present, purchased the Product for household use, and not for resale in the state of New York.
>
> **Ohio Subclass:** All persons who, from January 5, 2018, to the present, purchased the Product for household use, and not for resale in the state of Ohio.

128.    Excluded from the Class and Subclasses (collectively, "Classes") are Defendant,

any of Defendant's parent companies, subsidiaries and/or affiliates, officers, directors, legal

representatives, employees, or co-conspirators, all governmental entities, and any judge, justice,

or judicial officer presiding over this matter.

129.    This action is brought and may be properly maintained as a class action.  There is

a well-defined community of interests in this litigation and the members of the Classes are easily

ascertainable.

130.    The members of the proposed Classes are so numerous that individual joinder of

all members is impracticable, and the disposition of the claims of the members of all Classes in a

single action will provide substantial benefits to the parties and Court.

131.    Questions of law and fact common to Plaintiffs and the Classes include, but are not limited to, the following:

(a)     Whether Defendant owed a duty of care;

(b)     Whether Defendant owed a duty to disclose;

(c)     Whether Defendant knew or should have known that the Product contained or may contain Heavy Metals;

(d)     Whether Defendant failed to disclose that the Product contained or may contain Heavy Metals;

(e)     Whether the claims of Plaintiffs and the Classes serve a public benefit;

(f)     Whether Defendant's packaging is false, deceptive, and misleading based on the Omissions;

(g)     Whether the Omissions are material to a reasonable consumer;

(h)     Whether the inclusion of Heavy Metals in the Product is material to a reasonable consumer;

(i)     Whether the Omissions are likely to deceive a reasonable consumer;

(j)     Whether Defendant had knowledge that the Omissions were material and false, deceptive, and misleading;

(k)     Whether Defendant breached its duty of care;

(l)     Whether Defendant breached its duty to disclose;

(m)     Whether Defendant violated the laws of the state of California

(n)     Whether Defendant violated the laws of the state of New York;

(o)     Whether Defendant breached its implied warranties;

(p)     Whether Defendant engaged in unfair trade practices;

(q)     Whether Defendant engaged in false advertising;

(r)     Whether Plaintiffs and members of the Classes are entitled to actual, statutory, treble, and punitive damages; and

(s)     Whether Plaintiffs and members of the Classes are entitled to declaratory and injunctive relief.

132.     Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other members of the Classes.  Identical statutory violations and business practices and harms are involved.  Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

133.     Plaintiffs' claims are typical of those of the members of the Classes in that they are based on the same underlying facts, events, and circumstances relating to Defendant's conduct.

134.     Plaintiffs will fairly and adequately represent and protect the interests of the Classes, have no interests incompatible with the interests of the Classes, and have retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

135.     Class treatment is superior to other options for resolution of the controversy because the relief sought for each member of the Classes is small such that, absent representative litigation, it would not be feasible for members of the Classes to redress the wrongs done to them.

136.     Questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes.

137.     As a result of the foregoing, class treatment is appropriate.

## **CAUSES OF ACTION**

### **COUNT I**
### **Violations of The California Unfair Competition Law,**
### **Cal. Bus. & Prof. Code §§ 17200, *et seq.*,**

138.     Plaintiffs Prescott and Cooper incorporate by reference the allegations contained in the paragraphs above as if set forth fully herein.

139.    Plaintiffs Prescott and Cooper bring this claim individually and on behalf of the California Subclass members against Defendant.

140.    The Unfair Competition Law prohibits any "unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code §17200.

141.    Plaintiffs Prescott and Cooper, the California Subclass members, and Mars are each a "person" under California Business & Professions Code §17201.

**Fraudulent**

142.    Defendant's failure to disclose the presence (or material risk of presence) of Heavy Metals in the Product is likely to deceive the public.

**Unlawful**

143.    As alleged herein, Defendant's failure to disclose the presence (or material risk of presence) of Heavy Metals in the Product violates at least the following laws:

- The CLRA, California Business & Professions Code §§1750, *et seq.*;

- The False Advertising Law, California Business & Professions Code §§ 17500, *et seq.*, and

- The Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 109875, *et seq*.

**Unfair**

144.    Defendant committed unfair practices by selling the Product without adequate testing or screening for the Heavy Metals, which rendered the Product adulterated and misbranded.

145.    Defendant's conduct with respect to the packaging and sale of the Product is unfair because Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers, and the utility of Defendant's conduct, if any, does not outweigh the gravity of the harm to its victims.

146.    Defendant's conduct with respect to the packaging and sale of the Product is also unfair because it violates public policy as declared by specific constitutional, statutory, or regulatory provisions, including, but not limited to, the False Advertising Law.

147.    Defendant's conduct with respect to the packaging and sale of the Product is also unfair because the consumer injury is substantial, not outweighed by benefits to consumers or competition, and not one that consumers, themselves, can reasonably avoid.

148.    Defendant was obligated to disclose the presence of Heavy Metals in the Product because:

(a)     Defendant had exclusive knowledge of the presence of Heavy Metals in the Product that was not known or reasonably accessible to Plaintiffs Prescott and Cooper and the California Subclass; and

(b)     Defendant actively concealed the presence of Heavy Metals from Plaintiffs Prescott and Cooper and the California Subclass.

149.    Plaintiffs Prescott and Cooper and the California Subclass members relied upon the Product's packaging provided to them by Defendant when making their purchasing decisions.  Had Plaintiffs Prescott and Cooper and the California Subclass members known Defendant failed to disclose the presence of Heavy Metals on the Product's packaging, they would not have purchased the Product.

150.    In accordance with California Business & Professions Code §17203, Plaintiffs Prescott and Cooper seek an order enjoining Defendant from continuing to conduct business through fraudulent or unlawful acts and practices and to commence a corrective advertising campaign.

151.    Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiff's desire to purchase the Product in the future if he can be assured that the Product is safe for consumption and does not contain Heavy Metals.

152.    On behalf of themselves and the California Subclass, Plaintiffs Prescott and Cooper also seek an order for the restitution of all monies from the sale of the Product, which were unjustly acquired through acts of fraudulent, unfair, or unlawful competition.

153.    Plaintiffs Prescott and Cooper and California Subclass members have no adequate remedy at law for this claim.  Plaintiffs Prescott and Cooper plead their claim for equitable relief in the alternative, which inherently would necessitate a finding of no adequate remedy at law.

154.    Alternatively, legal remedies available to Plaintiffs Prescott and Cooper are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief.  *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also United States v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992) ("The mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable relief."); *Quist v. Empire Water Co.*, 2014 Cal. 646, 643 (1928) ("The mere fact that there may be a remedy at law does not oust the jurisdiction of a court of equity. To have this effect, the remedy must also be speedy, adequate, and efficacious to the end in view … It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and not in the future.").

155.    Furthermore:

(a)    To the extent damages are available here, damages are not equally certain as restitution because the standard that governs ordering restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiffs Prescott and Cooper fail to sufficiently adduce evidence to support an award of damages.

(b)    Damages and restitution are not necessarily the same amount. Unlike damages, restitution is not limited to the amount of money defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles the plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize.  Plaintiffs Prescott and Cooper seek such relief here.

(c)     Legal claims for damages are not equally certain as restitution because claims under the UCL entail few elements.  Further, the "unlawful" prong of the UCL is the only way for Plaintiffs Prescott and Cooper to vindicate violations of the Sherman Act because the Sherman Act contains no private right of action.

(d)     A claimant otherwise entitled to a remedy for unjust enrichment, including a remedy originating in equity, need not demonstrate the inadequacy of available remedies at law."  RESTATEMENT (THIRD) OF RESTITUTION § 4(2).

**COUNT II**
**Violation of California's False Advertising Law,**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.*,**

156.    Plaintiffs Prescott and Cooper incorporate by reference the allegations contained in the paragraphs above as if set forth fully herein.

157.    Plaintiffs Prescott and Cooper bring this claim individually and on behalf of the California Subclass members against Defendant.

158.    California's False Advertising Law prohibits any statement or omission in connection with the sale of goods "which is untrue or misleading."  Cal. Bus. & Prof. Code §17500.

159.    As set forth herein, Defendant's failure to disclose the presence (or risk of presence) of Heavy Metals in the Product is likely to deceive the public.

160.    Defendant knew the Product contained undisclosed levels of Heavy Metals. Defendant had a duty to disclose the presence of Heavy Metals, and by omitting their presence, misled consumers.

161.    Defendant knew, or reasonably should have known, that these Omissions were misleading to reasonable consumers.

36

162.    Had Defendant disclosed the presence (or risk of presence) of Heavy Metals in the Product or made consumers aware of its failure to disclose, Plaintiffs Prescott and Cooper and members of the California Subclass would not have purchased the Product.

163.    Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiff Prescott and Cooper's desire to purchase the Product in the future if they can be assured that the Product does not contain Heavy Metals.

164.    Plaintiffs Prescott and Cooper and the members of the California Subclass are entitled to injunctive and equitable relief, and restitution in the amount they spent on the Product.

165.    Plaintiffs Prescott and Cooper and California Subclass members have no adequate remedy at law for this claim.  Plaintiffs Prescott and Cooper plead their claim for equitable relief in the alternative, which inherently would necessitate a finding of no adequate remedy at law.

166.    Alternatively, legal remedies available to Plaintiffs Prescott and Cooper are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief.  *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also United States v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992) ("The mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable relief."); *Quist v. Empire Water Co.*, 2014 Cal. 646, 643 (1928) ("The mere fact that there may be a remedy at law does not oust the jurisdiction of a court of equity. To have this effect, the remedy must also be speedy, adequate, and efficacious to the end in view … It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and not in the future.").

167.    Furthermore:

(a)    To the extent damages are available here, damages are not equally certain as restitution because the standard that governs ordering restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that

Plaintiffs Prescott and Cooper fail to sufficiently adduce evidence to support an award of damages.

(b)     Damages and restitution are not necessarily the same amount. Unlike damages, restitution is not limited to the amount of money defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles the plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize.  Plaintiffs Prescott and Cooper seek such relief here.

(c)     Legal claims for damages are not equally certain as restitution because claims under the FAL entail few elements.

(d)     A claimant otherwise entitled to a remedy for unjust enrichment, including a remedy originating in equity, need not demonstrate the inadequacy of available remedies at law."  RESTATEMENT (THIRD) OF RESTITUTION § 4(2).

### COUNT III
**Violation of California's Consumers Legal Remedies Act,**
**Cal. Civ. Code §§ 1750, *et seq*.,**

168.    Plaintiffs Prescott and Cooper incorporate by reference the allegations contained in the paragraphs above as if set forth fully herein.

169.    Plaintiffs Prescott and Cooper brings this claim individually and on behalf of the California Subclass members against Defendant.

170.    Plaintiffs Prescott and Cooper and each proposed California Subclass member are "consumers," as that term is defined in California Civil Code §1761(d).

171.    The Product is "goods," as that term is defined in California Civil Code §1761(a).

172.    Plaintiffs Prescott and Cooper, the California Subclass members, and Defendant are each a "person" as that term is defined in California Civil Code §1761(c).

173.    Plaintiffs Prescott and Cooper and each of the California Subclass members' purchases of the Product constitute "transactions" as that term is defined in California Civil Code §1761(c).

174.     Defendant's conduct alleged herein violates at least the following provisions of California's Consumers Legal Remedies Act (the "CLRA"):

(a)     California Civil Code §1770(a)(5), by failing to make any mention of Heavy Metals in the Product;

(b)     California Civil Code §1770(a)(7), by knowingly, recklessly, and/or intentionally representing that the Product was of a particular standard, quality, or grade, when it was of another; and

(c)     California Civil Code §1770(a)(9), by knowingly, recklessly, and/or intentionally advertising the Product with intent not to sell it as advertised.

175.     The Omissions were material as reasonable consumers such as Plaintiffs Prescott and Cooper and the members of the California Subclass would deem the presence of Heavy Metals important in determining whether to purchase the Product.

176.     Defendant was obligated to disclose the presence of Heavy Metals in the Product because:

(a)     Defendant had exclusive knowledge of the presence of Heavy Metals in the Product, which was not known or reasonably accessible to Plaintiff and the members of the Class; and

(b)     Defendant actively concealed the presence of Heavy Metals from Plaintiff and the members of the Class.

177.     As a direct and proximate result of these violations, Plaintiffs Prescott and Cooper and the California Subclass members have been harmed, and such harm will continue unless and until Defendant is enjoined from using the misleading marketing described herein in any manner in connection with the advertising and sale of the Product.

178.     On January 13, 2023, counsel for Plaintiff Prescott sent Defendant written notice (via U.S. certified mail, return receipt requested) on behalf of himself and the California Subclass members that Defendant's conduct is in violation of the CLRA.  On January 25, 2023, counsel for Plaintiff Cooper sent Defendant written notice (via U.S. certified mail, return receipt

requested) on behalf of herself and the California Subclass members that Defendant's conduct is in violation of the CLRA.

179.    Defendant failed to provide appropriate relief for its violations of the CLRA §§1770(a)(5), (7), and (9) within thirty days of receipt of Plaintiffs Prescott and Cooper's notifications.  In accordance, with CLRA §1782(b), Plaintiffs Prescott and Cooper and the California Subclass are entitled, under CLRA §1780, to recover and obtain the following relief for Defendant's violations of CLRA §§1770(a)(5), (7), and (9):

    (a)    Actual damages under CLRA §1780(a)(1);

    (b)    Restitution of property under CLRA §1780(a)(3);

    (c)    Punitive damages under CLRA §1780(a)(4); and

    (d)    Any other relief the Court deems proper under CLRA §1780(a)(5).

180.    Plaintiffs Prescott and Cooper seek an award of attorneys' fees pursuant to, *inter alia*, California Civil Code §1780(c) and California Code of Civil Procedure §1021.5.

<u>**COUNT IV**</u>
**Breach of Implied Warranty of Merchantability**

181.    Plaintiffs incorporate by reference the allegations contained in the paragraphs above as if set forth fully herein.

182.    Plaintiffs Prescott, Cooper, and Horton bring this claim individually and on behalf of the Classes against Defendant, except as to the New York Subclass.

183.    Plaintiffs Prescott and Cooper bring this claim under the laws of the State of California.  Plaintiff Horton brings this claim under the laws of the State of Ohio.

184.    Defendant is a merchant engaging in the sale of goods to Plaintiffs Prescott, Cooper, and Horton and the members of the Classes.

185.     There was a sale of goods from Defendant to Plaintiffs Prescott, Cooper, and Horton and the members of the Classes.

186.     As set forth herein, Defendant manufactured and sold the Product, and prior to the time the Product was purchased by Plaintiffs Prescott, Cooper, and Horton and the members of the Classes, impliedly warranted that the Product was of merchantable quality and fit for its ordinary use (consumption by consumers).

187.     Plaintiffs Prescott, Cooper, and Horton relied on these implied warranties when they purchased the Product.

188.     The Product was not fit for its ordinary use (consumption by consumers) as it includes undisclosed levels of Heavy Metals that do not conform to the packaging.

189.     These promises became part of the basis of the bargain between Defendant, on the one hand, and Plaintiffs Prescott, Cooper, and Horton and the members of the Classes, on the other hand, and thus constituted implied warranties.

190.     Defendant breached its implied warranties by selling Product that contains Heavy Metals.

191.     Defendant was on notice of this breach as it was aware of the inclusion of Heavy Metals in the Product as a result of the As You Sow litigation and Consent Judgment, as well as the public investigation and report published by Consumer Reports that showed the Product contains Heavy Metals.

192.     Defendant impliedly warranted to Plaintiffs Prescott, Cooper, and Horton and the members of the Class that the Product did not contain contaminants such as Heavy Metals by failing to mention or disclose the presence of Heavy Metals while making promises about the

quality and nature of the Product, including that its Product must meet stringent quality expectations.

193.    As a direct and proximate result of Defendant's breach of its implied warranties, Plaintiffs Prescott, Cooper, and Horton and the members of the Classes suffered actual damages as they purchased the Product that was worth less than the price paid and that they would not have purchased at all had they known of the presence of Heavy Metals.

194.    Plaintiffs Prescott, Cooper, and Horton, on behalf of themselves and the members of the Classes, seek actual damages for Defendant's failure to deliver goods that conform to its implied warranties and resulting breach.

195.    On January 13, 2023, prior to the filing of this action, Defendant was served with a notice letter on behalf of Plaintiff Prescott and the Classes that complied in all respects with U.C.C. §§ 2-313 and 2-607.  On January 25, 2023, prior to the filing of this action, Defendant was served with a notice letter on behalf of Plaintiff Cooper and Horton and the Classes that complied in all respects with U.C.C. §§ 2-313 and 2-607.  Plaintiffs' counsel sent Defendant a letter advising Defendant that it breached an implied warranty and demanded that Defendant cease and desist from such breaches and make full restitution by refunding the monies received therefrom.

**COUNT V**
**Unjust Enrichment**

196.    Plaintiffs incorporate by reference the allegations contained in the paragraphs above as if set forth fully herein.

197.    Plaintiffs bring this claim individually and on behalf of the members of the Classes against Defendant.

198.    Plaintiffs allege this claim in the alternative pursuant to Fed. R. Civ. P. 8.

199.    Plaintiffs bring this claim under the laws of the States of New York, California, and Ohio.

200.    Substantial benefits have been conferred on Defendant by Plaintiffs and the members of the Classes through the purchase of the Product.  Defendant knowingly and willingly accepted and enjoyed these benefits.

201.    Defendant either knew or should have known that the payments rendered by Plaintiffs were given and received with the expectation that the Product would not contain Heavy Metals.  As such, it would be inequitable for Defendant to retain the benefit of the payments under these circumstances.

202.    Defendant was obligated to disclose the presence of Heavy Metals in the Product because:

(a)     Defendant had exclusive knowledge of the presence of Heavy Metals in the Product that were not known or reasonably accessible to Plaintiffs and the members of the Classes; and

(b)     Defendant actively concealed the presence of Heavy Metals from Plaintiffs and the members of the Classes.

203.    Defendant's acceptance and retention of the benefits of the payments from Plaintiffs and the members of the Classes under the circumstances alleged herein make it inequitable for Defendant to retain the benefits without payment of the value to Plaintiffs and the members of the Classes.

204.    Plaintiffs and the members of the Classes are entitled to recover from Defendant all amounts wrongfully collected and improperly retained by Defendant, plus interest thereon.

205.    Plaintiffs and the members of the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

<u>COUNT VI</u>
**Violation of New York Gen. Bus. Law § 349**

206.    Plaintiff Millman hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this complaint.

207.    Plaintiff Millan brings this claim individually and on behalf of the Members of the proposed New York Subclass against Defendant.

208.    Defendant committed deceptive acts and practices by employing false, misleading, and deceptive representations and/or omissions about the presence (or potential presence) of toxic heavy metals in its Product.

209.    Information as to the heavy metal content of its dark chocolate Product was in Defendant's exclusive control.  Plaintiff Millman could not possibly have known that the Product at issue contained toxic Heavy Metals because such information was not available to the public until late 2022.

210.    Plaintiff has standing to pursue this claim because she has suffered an injury-in-fact and has lost money or property as a result of Defendant's deceptive acts and practices. Specifically, Plaintiff Millman repeatedly purchased Defendant's Product.  In doing so, Plaintiff Millman relied upon Defendant's false, misleading, and deceptive representations that the Product was fit for human consumption and did not contain significantly elevated concentrations of lead or cadmium.  Plaintiff Millman spent money in the transaction that she otherwise would not have spent had she known the truth about Defendant's Product.

211.    Defendant's deceptive acts and practices were directed at consumers.

212.    Defendant's deceptive acts and practices are misleading in a material way because they violate consumers' reasonable expectations.  Defendant knew consumers would purchase its

Product and/or pay more for it under the false—but reasonable—belief that it was safe to consume regularly and did not contain significantly elevated levels of toxic Heavy Metals.

213.    Defendant knows that health information about its food products is material to consumers.  As a result of its deceptive acts and practices, Defendant sold tens if not hundreds of thousands of its dark chocolate Product to unsuspecting consumers across New York.

214.    If Defendant had advertised the Product truthfully and in a non-misleading fashion, Plaintiff and other New York Subclass Members would not have purchased it or would not have paid as much as they did for it.

215.    As a direct and proximate result of Defendants' false, misleading, and deceptive representations and/or omissions, Plaintiff Millman and other Members of the New York Subclass were injured in that they: (1) paid money for the Product that was not what Defendant represented; (2) were deprived of the benefit of the bargain because the Product they purchased was different than Defendant advertised; and (3) were deprived of the benefit of the bargain because the dark chocolate Product they purchased had less value than if Defendant had adequately disclosed the presence of heavy metals in it.

216.    On behalf of herself and Members of the New York Subclass, Plaintiff Millman seeks to enjoin Defendant's unlawful acts and practices and recover her actual damages or fifty (50) dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## COUNT VII
### Violation of New York Gen. Bus. Law § 350

217.    Plaintiff Millman hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this complaint.

218.    Plaintiff brings this claim individually and on behalf of the Members of the proposed New York Subclass against Defendant.

219.     Defendant engaged in a campaign of false advertising with regard to the safety and heavy metal content of its dark chocolate Product to mislead consumers into believing that the Product was safe for human consumption and did not contain high levels of heavy metals, namely lead and cadmium.

220.     Plaintiff has standing to pursue this claim because she has suffered an injury-in-fact and has lost money or property as a result of Defendant's deceptive acts and practices. Specifically, Plaintiff Millman repeatedly purchased Defendant's Product.  In doing so, Plaintiff Millman relied upon Defendant's false, misleading, and deceptive representations that the Product was fit for human consumption and did not contain significantly elevated concentrations of lead or cadmium.  Plaintiff Millman spent money in the transaction that she otherwise would not have spent had she known the truth about Defendant's Product.

221.     Defendant's deceptive acts and practices were directed at consumers.

222.     Defendant's deceptive acts and practices are misleading in a material way because they violate consumers' reasonable expectations.  Defendant knew consumers would purchase its Product and/or pay more for it under the false—but reasonable—belief that it was safe to consume regularly and did not contain significantly elevated levels of toxic Heavy Metals.

223.     Defendant knows that health information about its food products is material to consumers.  As a result of its deceptive acts and practices, Defendant sold tens if not hundreds of thousands of its dark chocolate Product to unsuspecting consumers across New York.

224.     If Defendant had advertised the Product truthfully and in a non-misleading fashion, Plaintiff and other New York Subclass Members would not have purchased it or would not have paid as much as they did for it.

225.     As a direct and proximate result of Defendant's false, misleading, and deceptive representations and/or omissions, Plaintiff Millman and other Members of the New York Subclass were injured in that they: (1) paid money for the Product that was not what Defendant represented; (2) were deprived of the benefit of the bargain because the Product they purchased was different than Defendant advertised; and (3) were deprived of the benefit of the bargain because the dark chocolate Product they purchased had less value than if Defendant had adequately disclosed the presence of heavy metals in it.

226.     On behalf of herself and Members of the New York Subclass, Plaintiff Millman seeks to enjoin Defendant's unlawful acts and practices and recover her actual damages or five hundred (500) dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment against Defendant as to each and every count, including:

(a)     An order declaring this action to be a proper class action, appointing Plaintiffs and their counsel to represent the Classes, and requiring Defendant to bear the costs of class notice;

(b)     An order enjoining Defendant from selling the Product until the Heavy Metals are removed or full disclosure of the presence of same appears on all packaging;

(c)     An order requiring Defendant to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling existing Product;

(d)     An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendant from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendant's past conduct;

(e)     An order requiring Defendant to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful,

unfair, or fraudulent business act or practice, untrue or misleading advertising, or a violation of law, plus pre- and post-judgment interest thereon;

(f) An order requiring Defendant to disgorge or return all moneys, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

(g) An order requiring Defendant to pay all actual and statutory damages permitted under the counts alleged herein, in an amount to be determined by this Court;

(h) An order requiring Defendant to pay punitive damages on any count so allowable;

(i) An order awarding attorneys' fees and costs to Plaintiffs and the Classes; and

(j) An order providing for all other such equitable relief as may be just and proper.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs request a trial by jury of all claims so triable.

Dated: July 24, 2023

Respectfully Submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Max S. Roberts*
      Max S. Roberts

Max S. Roberts
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: mroberts@bursor.com

**BURSOR & FISHER, P.A.**
L. Timothy Fisher*
Luke Sironski-White*
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4448
Facsimile: (925) 407-2700

E-mail: ltfisher@bursor.com
                lsironski@bursor.com

**LEVI & KORSINSKY, LLP**
Mark S. Reich
Courtney E. Maccarone
55 Broadway, 4th Floor, Suite 427
New York, NY 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
E-mail: mreich@zlk.com
             cmaccarone@zlk.com

**LAUKAITIS LAW LLC**
Kevin Laukaitis*
954 Avenida Ponce De Leon
Suite 205, #10518
San Juan, PR 00907
Telephone: (215) 789-4462
E-mail: klaukaitis@laukaitislaw.com

**CLARKSON LAW FIRM PC**
Bahar Sodaify*
Alan Gudino*
Ryan Ardi*
Ryan J. Clarkson*
22525 Pacific Coast Highway
Malibu, CA 90265
Telephone: (213) 788-4050
Facsimile:  (213) 788-4070
E-mail: bsodaify@clarksonlawfirm.com
             agudino@clarksonlawfirm.com
             rardi@clarksonlawfirm.com
             rclarkson@clarksonlawfirm.com

*Pro hac vice* forthcoming

*Attorneys for Plaintiffs*